ROBERT PALANO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Palano v. Commissioner
Docket No. 33532-85.
United States Tax Court
T.C. Memo 1987-211; 1987 Tax Ct. Memo LEXIS 205; 53 T.C.M. (CCH) 676; T.C.M. (RIA) 87211; April 27, 1987. William J. Neild, for the petitioner. Stephen C. Best, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: For the calendar year 1980 respondent determined a deficiency of $48,552.88 in petitioner's income tax including $676.00 in self-employment tax under section 1401(a), an addition to tax of $4,855.29 under section 6651(a)(1), [1] and an addition to tax of $2,427.64 under section 6653(a). *206 After concessions, the issues for decision are (1) whether petitioner had unreported income as determined by respondent; (2) whether petitioner is liable for self-employment tax under section 1401(a) and (3) whether petitioner is liable for the additions to tax under sections 6651(a) and 6653(a). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The written stipulation of the parties and exhibits associated therewith are incorporated herein by reference. Petitioner, a graduate of the University of Buffalo with a degree in physical education and health, resided in Williamsville, New York at the time he filed his petition. Although he was only 26 years old, petitioner during 1980 was the principal officer, director and stockholder of Burl World Creations, Inc. ("Burl World"), a New York corporation which removed redwood stumps from a vineyard in California, trucked the stumps to Buffalo, New York, where they were sawed into slabs, and sold the slabs at wholesale and retail as unfinished redwood materials or finished the slabs into furniture and sold the furniture at wholesale and retail. He also owned and managed an advertising agency and three parcels *207 of rental property. In addition to a salary from Burl World and the receipts from the advertising agency and the rental properties, petitioner's 1980 return also reflects a net profit from a landscaping business which he had with his brother. On a depreciation schedule included in the 1980 return, petitioner reported that one of his rental properties, a house and lot, was purchased on November 1, 1979 at a total cost of $23,200 and was improved in November of 1979 and June of 1980 at a total cost of $11,633. On a second depreciation schedule petitioner reported the purchase on July 7, 1980 of another parcel of rental property, a two and one-half story house and lot, for a total of $49,000, which was improved in July, August and September of 1980 at a total cost of $9,810. On a third depreciation schedule attached to the 1980 return, petitioner reported the purchase in 1977 of a one and one-half story house at a total cost of $44,500 which was used one half for rental and one half as a personal residence. During 1980 petitioner owned a 1979 BMW. In June of 1980 he purchased a Mercedes for $8,500 with a Western Union Money Order. During June 1980 he also purchased stock through *208 a broker for $10,000. On July 31, 1980, petitioner was arrested and jailed for several hours in Miami, Florida, when he attempted to purchase approximately 400 pounds of marijuana from agents of the Drug Enforcement Administration (the "DEA"). At the time of his arrest, he had in his possession cash in the amount of $119,400, which was seized by the arresting officers. On August 6, 1980, petitioner retained two Miami attorneys to represent him in any criminal or tax matter arising out of his arrest. In exchange for their services petitioner assigned to the attorneys the funds seized from him when arrested to the extent of $75,000. He then returned to his home in New York. Despite the efforts of petitioner's attorneys, the funds were never recovered. On his 1980 tax return, which was delinquently filed on September 25, 1981, petitioner reported $17,550 in salary from Burl World as well as the profits and losses from the advertising agency, the rental properties and the landscaping business. The total adjusted gross income reported on the 1980 return was $21,369, which included no receipts from the transporting of cars from New York to Florida or from any activity involving *209 marijuana. In the notice of deficiency, respondent determined that the $119,400 which petitioner had in his possession when arrested was taxable income to petitioner in 1980. Respondent also determined that petitioner failed to report certain items of interest and dividend income which petitioner conceded at trial. OPINION Unreported Income
Respondent's determination that the $119,400 seized from petitioner constituted taxable income to petitioner in 1980 is presumptively correct, and petitioner has the burden of proving otherwise. ; Rule 142(a). See also . Petitioner claims that the money did not belong to him. He testified that he was merely an agent for an individual that he had known in college, who in 1979 and 1980 was dealing in drugs in New York. At trial petitioner referred to this unnamed individual as his "sponsor," and stated that on two separate occasions, one in or about December 1979 and the other in January of 1980, petitioner at his sponsor's request drove a car to Florida. Petitioner further testified that he knew the cars he drove *210 to Florida were later used by others to transport drugs back to New York but he insisted that his participation in the operation at this time ceased when he delivered the cars to Florida and that with respect to each of the two trips he received only $500 plus expenses, including air fare back to Buffalo. In July 1980, according to petitioner, his sponsor asked him to again go to Florida and meet with Thomas Cardinal who would furnish him with money with which he was to buy marijuana and transport it back to New York. Petitioner claims that pursuant to these instructions he flew to Miami and met Tom Cardinal who took him to a house where he stayed for a few days. Cardinal then returned, gave petitioner the $119,400 in cash, and directed him to go with Ralph Alonzo to purchase marijuana. Petitioner further testified that in accordance with Cardinal's directions he went with Alonzo to a warehouse where he purchased about 400 pounds of marijuana with the cash, but unknown to him the sellers were DEA agents who immediately arrested petitioner and Alonzo. From the record as a whole we are satisfied that petitioner's version of the source of the $119,400 in cash is unworthy of belief *211 for the following reasons. First, he admitted that prior to the incident involving the cash he had knowingly driven cars to Florida for use by unnamed persons in transporting marijuana or other drugs to New York, but yet petitioner asks us to believe that his participation in these earlier episodes ceased with the delivery of the cars. He also admitted that prior to the disputed incident he was anxious to get further involved in drug transactions because he had always wanted to make "a lot of money." Second, his explanation of how he was able to purchase three parcels of real property, a BMW, a Mercedes and make substantial investments in stocks between 1977 and June of 1980 is also beyond belief. Petitioner testified that those purchases, which totaled over $160,000, were made with funds borrowed in part from a bank and in part from members of his family. The record, however, does not contain any note, mortgage or other document reflecting the alleged loans, or any check, book entry, or tax return reflecting a deduction for interest paid to any bank or individual. The absence of any explanation for petitioner's failure to produce such corroborating evidence, especially the *212 testimony of the members of his family from whom he allegedly borrowed part of the funds, gives rise to a presumption that if such evidence had been produced it would have been unfavorable to petitioner. , affd. . Third, the record contains no evidence which tends to corroborate any of petitioner's testimony with respect to the source of the $119,400 in cash except the testimony of William Schaefer of Leucadia, California. Schaefer testified that he was an Oriental Medical Doctor and had attended the University of Maryland, the Zen Center in Rochester, and the New England School of Acupuncture in Boston; that he got to know petitioner when the latter wrote and then telephoned him in California in January or February of 1980 seeking information about Chinese herbs; that later (after July 4, 1980) he met petitioner and spent two or three days visiting with him while Schaefer was on a trip to Rochester; and that during this visit they agreed to meet again later in July in Miami, Florida. According to Schaefer, petitioner was in Miami and called Schaefer at *213 his Miami hotel on July 19, 1980 and invited him to visit petitioner at the house where petitioner was staying. Schaefer also stated that he spent the night of July 19 with petitioner in the house, that early the next morning he was present when Tom Cardinal came to the house, that while Cardinal was present Schaefer saw for the first time a paper bag in which bread and eggs were visible; and that after Cardinal left, petitioner opened the bag, exhibited a great deal of cash beneath the bread and eggs and told Schaefer, "[T]here's more than a hundred thousand dollars in there." Schaefer further testified that he left the house shortly thereafter, returned to his hotel, and later went to California, and although he subsequently had several conversations with petitioner both on the telephone and in person, he did not learn of petitioner's arrest, loss of the money, or tax problems until about two or three weeks before the trial in 1986. From our observation of the attitude and demeanor demonstrated at the trial by both petitioner and Schaefer, we are forced to conclude that Schaefer's testimony had to have been carefully tailored in an attempt to corroborate at least part of petitioner's *214 claims. The attempt fails, however, primarily because Schaefer's alleged presence in Miami and the amount of his purported knowledge is just too "pat" or too perfect to be acceptable. In fact, the explanation by petitioner and Schaefer as to how Schaefer, a complete stranger to petitioner as late as January or February of 1980 and who had never actually met him until after July 4, 1980, could manage to be in the house in Miami on July 20, 1980, at precisely the moment that Tom Cardinal allegedly delivered the $119,400 in cash to petitioner is beyond the realm of reasonable probabilities. Furthermore, we find it difficult to believe that a man such as petitioner who was embarked upon an illegal drug transaction of over $100,000 would casually disclose the cash being used in the transaction to an individual he had been associated with, at the most, for three or four days. At trial, we were also unable to understand at first why the arrest of petitioner, his loss of the cash, and his subsequent tax problems were purportedly not disclosed by petitioner to Schaefer until a few weeks before the trial which occurred more than six years later. However, on cross examination petitioner *215 admitted that the existence of Schaefer as a possible corroborating witness was not made known by petitioner to respondent's agents during any pre-trial conference and not even to his own counsel until a few days before trial. With this admission the alleged lack of discussion of the incident between petitioner and Schaefer became apparent. It was an attempt to explain the failure of petitioner and his counsel to disclose Schaefer's testimony in sufficient time to permit its truth or falsity to be established by respondent prior to trial. Finally, we are not convinced of the truth of petitioner's contention that the money did not belong to him because he certainly acted as if he were the owner when he assigned part of it to his attorneys. In view of petitioner's knowledge and desire to make a lot of money fast, his knowledge of and even participation in previous drug related activities, his failure to report as income the amounts received in such activities, his failure to come forward with any corroborating evidence as to the source of the funds used to accumulate over $160,000 in assets in less than three years, and our inability to accept at face value his testimony and the *216 testimony of his only witness, we conclude on this record that the explanation for the source of the $160,000 as well as the $119,400 is, as contended by respondent, participation by petitioner in drug transactions prior to July 20, 1980. In any event, petitioner has failed to prove to our satisfaction that as he contends the $119,400 did not belong to him. Consequently respondent's determination that the $119,400 was unreported taxable income to petitioner in 1980 is sustained. Self-Employment Tax
Respondent determined that petitioner is liable for self-employment tax in the amount of $676.00 under section 1401(a). Petitioner has the burden of proving that the determination is erroneous. ; Rule 142(a). Since petitioner presented no proof on this issue we conclude that he has abandoned it, and respondent's determination is sustained. Additions to Tax Under Section 6651(a)(1) and 6653(a)
Respondent also determined that petitioner is liable for the addition to tax under section 6651(a)(1) for failure to file a timely return and the addition to tax under section 6653(a) for negligence. The addition to tax under *217 section 6651(a)(1) is properly imposed whenever a taxpayer fails to file a timely return unless such failure is due to reasonable cause and not to willful neglect. The addition to tax under section 6653(a) is properly imposed when an underpayment of tax is due to the taxpayer's negligence or intentional disregard of rules or regulations. From this record we are satisfied that petitioner without reasonable cause failed to file a timely return for 1980 and that the underpayment in tax for that year is due to intentional underreporting or at least negligence. Therefore, respondent's determination with respect to both additions to tax is sustained. Decision will be entered for respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided.↩